UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Minnesota Specialty Crops, Inc.,

Plaintiff,

vs. ORDER

Minnesota Wild Hockey Club, L.P., and NHL Enterprises, L.P.,

Defendants, Civ. No. 00-2317 (JRT/RLE)

* * * * * * * * * * * * * * * * * * *

At Duluth, in the District of Minnesota, this 16th day of August, 2001.

* * *

On June 7, 2001, the Court heard argument on the Plaintiff's Motion to Compel, and on the Plaintiff's informal Motion to Limit Third-Party Subpoenas. At the time of the Hearing, the Plaintiff appeared by Peter M. Lancaster, Esq., and the Defendants appeared by Nicole A. Engisch, Esq. For reasons which follow, the Plaintiff's Motion to Compel is granted in part, and the Plaintiff's informal Motion to Limit Third-Party Subpoenas is granted.

II. Factual and Procedural Background

This is a trademark infringement action, which was filed by the Plaintiff Minneapolis Specialty Crops, Inc. ("MSC"), against the Minnesota Wild Hockey Team ("the Team"), and NHL Enterprises,

FILED AUG 16 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD______
DEPUTY CLERK______

L.P., concerning the use of the "MINNESOTA WILD" design mark. MSC is a corporation, which is based in McGregor, Minnesota, which has been using the "MINNESOTA WILD" design mark since 1990, in identifying jellies, food products, clothing, wine, and other goods, that it manufactures and distributes to local grocery, and liquor retail outlets.

After the Team chose the design mark "MINNESOTA WILD" as its official logo, MSC filed this trademark infringement action. As noted by the Team, MSC's lawsuit does not seek to prevent the Team from employing the phrase "MINNESOTA WILD" to identify itself. See, Complaint, at ¶1. Rather, MSC claims that the Team's use of the MINNESOTA WILD design mark, to market and sell various products, including food, clothing, and beverages, is causing, and will continue to cause, a likelihood of confusion between the two entities, and their products.

III. Discussion

A. The Plaintiff's Motion to Compel.

1. Standard of Review. The threshold requirement of discoverability is whether the information sought is "relevant to the claim or defense of any party." Rule 26(b)(1), Federal Rules of Civil Procedure (2001). Of course, to be discoverable, the information "need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of

admissible evidence." Id. The standard, therefore, is widely recognized as one that is necessarily broad in its scope in order to allow the parties essentially equal access to the operative facts. See, Hofer v. Mack Trucks, Inc., 981 F.2d 377, 382 (8th Cir. 1992); Leighr v. Beverly Enterprises-Kansas, Inc., 164 F.R.D. 550 (D. Kan. 1996); Cox v. E.I. Du Pont de Nemours & Co., 38 F.R.D. 396, 398 (D.S.C. 1965).

Notwithstanding the liberality of discovery, however, it is not without bounds. As our Court of Appeals has observed:

> [T]his often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery. Some threshold showing of relevance must be made before parties are required to open wide the doors of discovery and to produce a variety of information which does not reasonably bear upon the issues in the case.

Hofer v. Mack Trucks, supra at 380.

Therefore, despite the liberality of discovery, we remain reluctant to allow any party to "roam in the shadow zones of relevancy and to explore matter which does not presently appear germane on the theory that it might conceivably become so." Carlson Cos., Inc. v. Sperry & Hutchinson Co., 374 F. Supp. 1080, 1089 (D. Minn. 1974); see also, Blum v. Schlegel, 150 F.R.D. 38, 39 (W.D.N.Y. 1993).

2. Legal Analysis. MSC's Motion to Compel involves three different categories of information which, for the sake of clarity, will be addressed separately.

a. Documents Relating to Revenue and to the Value of Naming Rights.

In its Motion to Compel, MSC requests an Order directing the Team to respond to several Document Requests, and Interrogatories, that relate to the revenues, and benefits, that are allegedly derived by the Team through its use of the MINNESOTA WILD design mark. Specifically, MSC has served the Team with the following Document Requests:

Request No. 29

> All documents in your possession relating to the value of the naming rights for the Xcel Energy Center and/or Touchstone Energy Place, including, but not limited to, documents sufficient to substantiate the terms of Xcel Energy's acquisition of naming rights for the Xcel Energy Center and of Touchstone Energy's acquisition of naming rights for Touchstone Energy Place.

* * *

Request No. 30

> All management agreements and lease agreements between either Defendant and any other party, or between any subsidiary or affiliate of either Defendant and any other party, relating to the Xcel Energy Center, Touchstone Energy Place or RiverCentre.

* * *

Request No. 33

> Annual financial statements and/or reports for each Defendant from 1998 to the present, and quarterly financial statements and/or reports

> for all periods after the date of the last annual statement or report.

Declaration of Peter M. Lancaster; Ex. A.

In addition, MSC has served upon the Team the following Interrogatories:

> Interrogatory No. 1
>
> Identify each person or entity who is or has ever been licensed or permitted by you to Use Defendants' Marks.
>
> Interrogatory No. 2
>
> Identify all services or products with which Defendants Use, intend to Use, or have Used Defendants' Marks (singularly or in combination with other words, letters of symbols), indicating the time period, or presently planned time period, for each such use, and indicating all geographic areas (by city and/or state) in which you have sold or offered for sale each product identified.

Id.

Finally, MSC has served a Rule 30(b)(6) deposition notice, which seeks corporate testimony, from the Team, regarding the following:

> Topic No. 1
>
> All revenues, costs, and profits from sales of goods or from licensing for sales of goods bearing the MINNESOTA WILD mark.

Id.

According to MSC, the information sought in these discovery requests is relevant, because the patent statute allows it to recover lost profits as compensation for the Team's infringement. See,

Title 15 U.S.C. §1117.[1] Since profits include the value derived through the licensing value of a mark, see, e.g . Sands v. Taylor & Wood Co. v. Quaker Oats, 34 F.3d 1340, 1344-1345 (7th Cir. 1994), and because the overall revenues of the Team are relevant to the "profits" analysis, MSC contends that its discovery requests are appropriate.

In contrast, the Team contends that MSC is only entitled to recover lost profits that are directly attributable to the alleged infringement. See, A&H Sportswear Inc. v. Victoria's Secret Stores, Inc., 166 F.3d 197 (3rd Cir. 2000)(lost damages must be proximately caused by the alleged infringement to be compensable). As argued by the Team, this lawsuit is focused solely on the infringement of items such as food, beverages, retail store operations, and clothing, which bear the MINNESOTA WILD design mark.

[1]Title 15 U.S.C. §1117 provides, in relevant part as follows:

> (a) When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a), (c), or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.

MSC's business does not extend into other categories, and therefore, values derived through stadium naming rights, licensing agreements, and the like, are not relevant.

We agree with the Team, and therefore, this aspect of the MSC's Motion is denied.[2] At the core, MSC contends that marketing, which has been conducted for the specific benefit of the Team's hockey operations, creates spillover benefits for the sale of various types of non-hockey related goods. Therefore, MSC argues, dividing revenue and expense information into subcategories -- such as for food, beverages, and clothing sales -- "ignores the synergies that are the entire basis of [the Team's] marketing operations." Plaintiff's Memorandum in Support of Motion to Compel, at 17.

We agree with the general proposition, that the Team uses publicity from its hockey operations to generate sales and revenue in product areas that are unrelated to hockey, per se. However, at Trial, MSC will be limited to the recovery of damages that are attributable to any alleged infringement. In its Complaint, MSC has expressly limited the offending infringement by alleging as follows:

---

[2]According to the Team, it has agreed to produce discovery materials involving revenues, costs, and profits, which relate to the sale of food, clothing, beverages, and to the Team's retail store operations.

> MSC **does not** seek to prevent the Hockey Club from continuing to use the name MINNESOTA WILD to identify its hockey team. Instead, MSC seeks merely to protect **its own core business** from destruction * * *.

Complaint, at ¶1 [emphasis added].

According, at issue is the confusion associated with the use of the MINNESOTA WILD design mark, as it pertains to the core areas of business of MSC, i.e. food, beverages, clothing, and retail store operations, and not aspects of the Team's use of MINNESOTA WILD to garner fans of hockey. Although the employment of the MINNESOTA WILD mark to identify an active professional hockey team undoubtedly draws additional revenue for the Team within MSC's core business areas, MSC has failed to demonstrate that the use of the design mark, within the context of food, beverages, and clothing sales, creates additional revenue in areas completely unrelated to those core areas of business. By way of but one example, MSC has failed to demonstrate, directly or indirectly, that fans of hockey attend the Team's games, because of the presence of food, beverages, and clothing, that bear the design mark. MSN admits as much, in its Complaint, by electing not to challenge the Team's use of the MINNESOTA WILD mark to identify its hockey operations.

As a result, there is no reason to believe, and MSC offers no evidence to show, that the use of the MINNESOTA WILD mark, within the context of food, beverage, and clothing sales, has had any

influence, whatsoever, on the amount of revenues that are derived by the Team through: (1) licensing arrangements for products unrelated to food, beverages, and clothing; (2) revenues derived through the sale of products unrelated to food, beverages, and clothing; (3) revenues derived through naming rights for the EXCEL ENERGY CENTER, or the TOUCHSTONE ENERGY PLACE; or, (4) the Team's total revenues. Clearly, these revenues are related to the Team's employment of the mark in marketing its hockey operations and, therefore, they have no relevance to the claims that are at issue in this case, namely, the protection of MSC's "core business." Complaint, at ¶1.

Further, contrary to MSC's interpretation, we find that the Third Circuit's decision, in A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3rd Cir. 2000), supports a limitation in the scope of discovery here. In A & H Sportswear, the plaintiff was the manufacturer of a swimsuit designated as THE MIRACLESUIT, who challenged Victoria Secret's use of the designation THE MIRACLE BRA, to identify a certain segment of its swimwear, and lingerie. Ultimately, after several appeals, the Third Circuit, in one aspect of its lengthy opinion, considered the import of economic disparity, between two entities, in reverse confusion cases. The Third Circuit noted that the District Court had held that, before it considered whether reverse confusion was present, the

plaintiff needed to demonstrate, as a threshold matter, "'that Victoria's Secret used their economic power to overwhelm the market with advertising' of their product." Id. at 234, quoting A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 57 F. Supp.2d 155, 178 (E.D. Pa. 1999). In effect, the District Court began its inquiry by comparing the commercial strengths of THE MIRACLESUIT and THE MIRACLE BRA. See, A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 235 (3rd Cir. 2000).

Ultimately, the Third Circuit rejected the District Court's approach, by stating, "[t]he District Court was correct to note that commercial disparity is, in fact, a factor to consider * * * however, it erred in applying a threshold commercial disparity requirement." Id. As noted by the Court, the District Court's inquiry focused on Victoria Secret's saturation of the market, with MIRACLE BRA advertising, a "meaningful portion" of which went towards promoting the MIRACLE BRA swimwear, and on the plaintiff's effort to promote its MIRACLESUIT swimwear. Id. Therefore, the District Court's inquiry focused on the advertising expenditures of the two competing entities, within the market that was the subject of the underlying lawsuit.

It was this comparison that was cited with approval, by the Third Circuit, when it expressly concluded that, under Interpace Corp. v. Lapp, Inc., 721 F.2d 460 (3rd Cir. 1983), commercial dis-

parity is a factor to consider when evaluating reverse confusion claims. However, nowhere in the Third Circuit's opinion is there a suggestion that a comparison of revenues, i.e., an analysis of commercial disparity, completely unrelated to the sales of MIRACLE BRA swimwear and lingerie, and MIRACLESUIT swimwear, was necessary to examine the validity of the plaintiff's reverse confusion claim. Here, an analysis of the commercial disparity, including advertising revenues, between the Team and MSC, may well be relevant to an analysis of MSC's reverse confusion claims but, as determined by the Third Circuit's most recent A & H Sportswear decision, such an analysis should be limited to the revenues, and products, that are relevant to thc infringement claims that are at issue in the lawsuit. As reflected in MSC's Complaint, those claims involve the sale of food, beverages, clothing, and miscellaneous products, as well as retail store operations. Since MSC's discovery requests are not so limited, this aspect of its Motion to Compel is denied.

b. The Canadian Litigation Documents. MSC seeks to force the Team to produce its litigation file regarding a trademark dispute that is currently taking place in Canada. Specifically, MSC has requested that the Team produce, "[a]ll documents relating to any anticipated, ongoing, or completed administrative or legal proceedings with the Canadian Wildlife Federation, and any other

documents relating to any disagreements or communications with the Canadian Wildlife Federation." Lancaster Dec; Ex. A.

The Team initiated this lawsuit, in Canada, against the Canadian Wildlife Federation, which is the publisher of a children's magazine called "Wild Magazine," in order to prevent the magazine from using the "Wild" trademark. According to MSC, in the Canadian litigation, the Team argues that there is a likelihood of confusion because of the magazine's use of the "Wild" name. Here, however, the Team is asserting that there is no potential for confusion attributable to MSC's use of the phrase "MINNESOTA WILD" to name its jellies, clothing, and other food and retail products. Since these positions are inherently inconsistent, MSC argues that it should be allowed to gain access to the Team's litigation documents, so that the Jury can consider the inconsistent positions which have been taken by the Team.

We agree. If, as MSC suggests, the Team is asserting, in Canada, that the use of the WILD mark by the Canadian Wildlife Federation, could cause actionable confusion, while contemporaneously asserting that its use of the Wild mark will not cause any confusion with the sale of MSC's core products employing the same mark, then the documents are plainly relevant, for credibility, or impeachment purposes. While any contradiction may be justified by differences in the trademark laws of Canada, and of the United

States, such differences would not shield the requested information from discovery.

At the Hearing, consistent with our directive, the Team agreed to produce any publically available documents, i.e., pleadings, and Court filings, in the Canadian litigation, but the Team refused to produce documents from its litigation file, contending that these materials are protected by the attorney work-product privilege. As this issue was not briefed by the parties, we have no means to appraise the validity of the claimed privilege. Accordingly, the parties are directed to "meet and confer," in an effort to determine the extent of the production that is necessary, on the part of the Team. Clearly, materials which disclose attorney work-product need not be produced, unless subject to some exception. If, however, after the "meet and confer," the parties are unable to agree on the extent of the Team's production, they should request further direction from this Court.

c. <u>Documents Protected by the Attorney-Client Privilege</u>.

Next, MSC argues that it should have access to a wide range of attorney-client communications which concern any legal advice, received by the Team, relating to the adoption of the MINNESOTA WILD mark, because the Team assertedly waived any attorney-client privilege by making statements to the press about

this advice. Specifically, following the initial decision to designate the hockey team as the "MINNESOTA WILD", the Team began receiving negative press because of MSC's prior use of that mark. In response, representatives of the Team issued several press releases which generally stated that the Team had consulted with lawyers, and had received advice to the effect that the Team's use of the MINNESOTA WILD mark was lawful. For example, the Team issued, to the media, a "Minnesota Wild Fact Sheet" which stated as follows:

> The team reviewed the situation with its legal counsel and has determined that the team has the legal rights to use the name Minnesota Wild in the conduct of its business as an NHL team.

Lancaster Dec.; Ex. C., at 15.

Also, in an article published in a January of 1998 edition of the St. Paul Pioneer Press, Jac Sperling, who is the Team's CEO, is alleged to have stated, as follows:

> Jac Sperling * * * said he and the team investors were aware of the business in McGregor but said he had been assured there was no conflict.
>
> * * *
>
> "The name 'Wild' is used in a number of different contexts. Our lawyers believe we have clear use of the name."

Id., at 17.

According to MSC, because the Team publicly relied upon the advice of legal counsel to justify its assertedly infringing conduct, it should be required to disclose the contents of those communications. In pursuit of that disclosure, MSC served the following discovery requests to the Team:

> 11. Identify all occasions prior to January 22, 1998 on which you obtained legal advice relating to Plaintiff's Marks or Defendant's Marks.
>
> 12. State whether any searches were conducted for the mark MINNESOTA WILD (as opposed to WILD), and if no such search was conducted, explain why not.
>
> 24. [Produce] [a]ll documents constituting, referring, or relating to any studies, searches, investigations and legal opinions, conducted or prepared with respect to Plaintiff's Marks, Defendants' Marks, or alternative marks considered by Defendants, including, but not limited to, those conducted or prepared to determine the existence of any possible conflicts, legal or otherwise.

Lancaster Dec.; Ex. A., at 2-3, 5.

Predictably, the Team initially objected to producing this information, and objected to answering questions in depositions concerning what legal advices it had received. Specifically, the Team contended that the comments, which the Team had made to the media, were insufficient to constitute a waiver of the attorney-client privilege.

Subsequent to the Hearing, however, both parties submitted, to the Court, letters which advised that this issue may have been resolved by the Team's recent decision to employ the "advice of counsel" defense. Specifically, in a letter dated June 20, 2001, counsel for MSC argued that, in response to an Interrogatory request, the Team disclosed its intent to establish that it acted in good faith, on the advice of counsel. See, Lancaster Letter dated June 20, 2001; Defendant's Objections and Answers to Plaintiff's Third Set of Interrogatories, at 3.[3] As a result, counsel for MSC suggested that this Interrogatory response constituted a waiver of privilege, which "remove[d] any question as to whether defendants

---

[3]Specifically, the Team's Answer to MSC's Interrogatory averred as follows:

> Subject to the objections and without waiving the same, Defendants respond as follows: Defendants expect to establish that they acted in good faith at all times including good faith reliance on advice of counsel. Defendants expect to assert good faith conduct for all purposes permitted by law, including as a defense to liability or a limitation on the recovery of damages. Defendants expect to prove and substantiate their good faith through the testimony of witnesses and the introduction of documentary evidence including, but not limited to, trademark search requests and reports.

Lancaster Letter dated June 20, 2001; Defendant's Objections and Answers to Plaintiff's Third Set of Interrogatories, at 3.

are obliged to turn over the documents they previously claimed to be privileged." Id.

In turn, in a letter dated June 21, 2001, counsel for the Team stated as follows:

> We do not believe Mr. Lancaster's interpretation is accurate * * *. Our view is that Plaintiff's motion to compel with respect to the attorney-client privilege asserted as to communications between the client and counsel on the naming issue will be resolved as a result of Defendants' decision to assert a defense based on a good faith reliance on advice of counsel. Defendants will produce witnesses for depositions, if Mr. Lancaster desires, and any pertinent documents to establish good faith reliance. To that extent only, disputes over what is protected by the attorney client privilege may be resolved. If Mr. Lancaster is contending, as he appears to be, that Defendants must now divulge every single privileged communication relating to MINNESOTA WILD or turn over every privileged document that they have logged on their privilege log, we strongly disagree with his position. Under the circumstances, we believe it most appropriate for the parties to arrange for a meet and confer session to discuss precisely the scope of the privilege waiver in light of Defendants' assertion of good faith reliance on advice of counsel defense. If ultimately the parties are unable to agree on the scope of the privilege waiver, we can then provide the Court with our respective arguments, appropriately briefed, so that the Court can be fully informed as to both side's positions before issuing a ruling.

Nicole A. Engisch Letter dated June 21, 2001.

Given the dearth of information concerning the Team's recent election to rely upon an advice of counsel defense, we are no longer

appropriately positioned to rule on this aspect of MSC's Motion to Compel, as it had been previously briefed. Accordingly, we direct the parties to expeditiously, but responsibly, exhaust their "meet and confer" obligations, in an attempt to resolve this aspect of their discovery dispute. In the event that the parties are unable to agree on the scope of the privilege waiver, they may promptly resubmit this issue for our resolution.[4]

2. <u>The Plaintiff's Informal Motion to Limit Third Party Subpoenas</u>.

Included amongst MSC's written submissions to the Court was a request that we control the assertedly vexatious litigation

---

[4]On July 13, 2001, the Defendants submitted another letter to the Court, regarding the scope of their privilege waiver, in light of the recent assertion of the advice of counsel defense. Specifically, the Defendants state, in relevant part:

> It is Defendants' position that Plaintiff's motion to compel production of privileged documents, one of the issues presented to the Court at the hearing on Plaintiff's Motion to compel discovery * * * has now been resolved by the parties. Namely, in light of their assertion of a good faith reliance on the advice of counsel defense, Defendants have agreed to produce, and have now produced, documents protected by the attorney-client privilege and/or work product doctrine.

<u>Nicole A. Engisch Letter dated July 13, 2001.</u>

This letter fails to reveal whether the Plaintiff agrees with the Defendants' position as to the necessity of further production of privileged documents. Hence, we will leave the decision to seek further Court intervention, on this issue, to the parties.

tactics, which have been recently been deployed by the Team. As related by MSC, in the three weeks prior the Hearing on this Motion to Compel, the Team issued subpoenas to "virtually everyone defendants can find who has done business of any significance with MSC." Plaintiff's Memorandum in Support of Motion to Compel, at 21. Allegedly, these subpoenas seek an extensive array of information from each of these entities, regarding their business affairs with MSC. As such, MSC argues as follows:

> There is no plausible basis for concluding that all those subpoenas are likely to lead to the discovery of admissible evidence. * * * The issues covered by the subpoenas were not significant enough to defendants to cause them even to conduct questioning of MSC witnesses on the topic as to which they are * * * serving subpoenas. It is difficult to interpret the subpoenas as anything other than messages to business associates of MSC that they will pay through legal harassment for having the temerity to do business with MSC when MSC is challenging entities with the power of defendants.

Id.

In response to these accusations, the Team asserts that its subpoenas were merely intended to uncover information regarding MSC's sales, in order to verify MSC's claim that, following the commencement of the Team's use of the name MINNESOTA WILD, its revenues from wine sales have fallen significantly. See, Defendant's Memorandum in Opposition to Plaintiff's Motion to Compel Discovery, at 12. According to the Team, it was forced to seek this information

from third parties, because MSC "either refused to produce all of the discovery regarding these matters or, in some cases, asserted that third parties held the relevant information." Id. at 13, citing Declaration of Timothy P. Griffin, at ¶2, and Tabs B, C.[5]

In our view, subpoenas issued under the aegis of Rule 45, Federal Rules of Civil Procedure, which are intended to secure the pretrial production of documents and things, are encompassed within the definition of "discovery," as enunciated in Rule 26(a)(5) and, therefore, are subject to the same constraints that apply to all of the other methods of formal discovery. See, Marvin Lumber and Cedar Co. v. PPG Industries, Inc., 177 F.R.D. 443, 443-44 (D. Minn. 1997)("We conclude that Rule 45 Subpoenas, which are intended to secure the pretrial production of documents and things, are encompassed within the definition of 'discovery,' as enunciated in Rule 26(a)(5) and, therefore, are subject to the same time constraints that apply to all of the other methods of formal discovery."). Of course, Rule 26(c) clearly contemplates the issuance of an Order which protects a party from "annoyance, embarrassment, oppression, or undue burden or expense," and includes a directive that "dis-

---

[5]According to MSC, the assertions contained in the Declaration of Timothy P. Griffin are false. At the Hearing, MSC averred that it produced, to the Team, virtually all of its sales records. In response, the Team argued that, because this information was not produced in a summarized format, it was forced to seek discovery, from third parties.

closure or discovery not be had."[6] Here, it appears that such an Order may be necessary in order to deter the Team from engaging in what is, in our considered view, a wholly inappropriate use of Subpoenas Duces Tecum.

At the Hearing, the Team advised that it considered its large-scale use of subpoenas to be necessary, because of MSC's allegedly inadequate discovery responses. However, the Team failed to explain why it chose to seek this information from entities which have absolutely no involvement in this lawsuit, rather than by simply seeking this Court's assistance, by the filing of a Motion to Compel against MSC. We find the Team's contention perplexing particularly in light of the Team's issuance of six subpoenas after MSC had expressly requested relief from this Court. Here, the Record reveals that, on May 24, 2001, MSC requested this Court's intervention, ostensibly on behalf of MSC's customers, who had been

---

[6]We note that the Supreme Court has long instructed that the discovery Rules, including those prescribed by Rules 16 and 26, should be read in pari materia. For example, in Hickman v. Taylor, 329 U.S. 495, 505 (1947) the Court observed, as follows:

> It matters little at this late stage whether Fortenbaugh fails to answer interrogatories filed under Rule 26 or under Rule 33 or whether he refuses to produce the memoranda pursuant to a subpoena under Rule 45 or a court order under Rule 34. The deposition-discovery rules create integrated procedural devices.

served with such a subpoena, and yet, a five days later, on May 29, 2001, the Team served an addition six subpoenas, thereby effectively precluding this Court from acting upon MSC's request for relief.[7] To the extent that the recipients of the subpoenas have not responded, we direct the Team to demand no response, and, should the Team seek to issue further third-party subpoenas, we direct that they demonstrate, to this Court, good cause for doing so. Id.

We recognize that no recipient of a subpoena has sought to quash the production of information the subpoena requires, but that is an economic reality of modern day litigation -- it is far more economic to acquiesce, in most instances, than to hire legal counsel to preclude the overreaching here evident in the Team's approach. We further recognize that MSC has only an assailable standing to object to the subpoenas at issue, but the subpoenas, which have been served, are an exercise of this Court's authority, and we do not lightly overlook what has the facial appearance of an abuse of this Court's subpoena power. If, as the Team urges, the

[7]At the Hearing, the Team suggested that it ignored MSC's request for relief because it wanted to adhere to a previously formulated schedule for the dissemination of third-party subpoenas. We accept defense counsel's sincere expression of regret for the issuance of the six additional subpoenas, and reiterate our statement, at the time of the Hearing, that her good faith is not at issue. Nonetheless, we view the barrage of subpoenas, directed at MSC's customers, to be troubling.

information, which has been sought by the subpoenas, is not available from MSC, the Team may advise this Court of the need for the use of third-party subpoenas, and we will consider the issue further. Until that time, we are hard-pressed to view the Team's deployment of the subpoenas, to a vast array of MSC's customers, as something other than an economic weapon akin to the proverbial "shot across the bow."

NOW, THEREFORE, It is --

ORDERED:

1. That the Plaintiff's Motion to Compel [Docket No. 16] is GRANTED in part, and DENIED in part, as more fully explained in the text of this Order.

2. That the Plaintiff's Informal Motion to Limit Third Party Subpoenas is GRANTED, to the extent prescribed in the text of this Order.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE